The next case today is N.R. v. Raytheon Company et al. Appeal number 201639. Attorney Hamburger, please introduce yourself on the record. Good morning, Chief Justice Howard and members of the panel. I'm Eleanor Hamburger, a peer on behalf of the appellant N.R. and with the court's permission, I'd like to reserve three minutes for rebuttal and counsel from the Department of Labor will speak for five minutes. Yes. Plaintiff properly pled his Mental Health Parity Act claims. When the District Court dismissed this case under Rule 12b-6, it set an impossible and unfair bar for pleading a Parity Act claim. The District Court ignored the holdings of other District Court judges in this circuit and the prevailing standard for pleading a Parity Act claim throughout the country. Plaintiff did everything right to plead his claim. He pled that the plan's habilitative services and non-restorative speech therapy exclusions applied only to mental health services. He alleged that the exclusions did not apply to any medical and surgical services and he cited to the terms of the plan and his explanations of benefits that supported his allegations. He also cited that he asked the plan administrator through his counsel to identify the physical conditions, if any, to which it applied the exclusions and the non-quantitative treatment limitation or NQTL analysis that was undertaken and required by law. The plan administrator refused to respond. Nothing more is required at this stage. Plaintiffs cannot be asked to plead facts and information to which they have no access. My argument is three main points. First, that a Parity Act claim was properly pled under Rule 12b-6. Second, that all the standard ERISA claims here may proceed. And third, that the plan's failure to respond to a Parity Act disclosure request is subject to ERISA sanction. Unless the court has questions, I'll proceed on those points. First, the Parity Act claim was properly pled. Plaintiff pled that the plan violates the Parity Act by applying the habilitative and non-restorative speech therapy exclusions only to mental health conditions. He pointed to evidence in the literal terms of the plan. Habilitative services are defined as a type of mental health services in the plan, and the non-restorative speech therapy exclusion is the only example of habilitative services provided. The plaintiff's explanations of benefits over and over and over again show that his diagnosis with autism was the sole reason for the denial, not any analysis of whether it was restorative. Denials were triggered every single time by his diagnosis. And second, this is consistent with the history of the term habilitative. Prior to the Affordable Care Act, the only time that term appears in case law and in statute is in relationship to services for developmental disabilities like autism. It was added by Congress to the Affordable Care Act to make sure that services for people with developmental disabilities were not left behind in this massive change of health coverage. And third, if you go through the plan, the only time habilitative and non-restorative speech therapy is referred to is in relationship to autism services. No other diagnosis or condition is identified in the plan as triggering the exclusion. The defendant's response is twofold. First, they say, well, even though we didn't tell you ahead of time, we exclude non-restorative services for medical and surgical conditions like for a cleft palate. That is a disputed question of fact. Their statement in a brief cannot be the basis for dismissing a case at the pleading stage. Second, defendants argued that the claims were not pled with enough specificity because the plaintiff did not allege the requirements and standards applied to the plan to medical and surgical benefits, nor how those requirements or standards differed. Well, first of all, they're wrong. We pled that the exclusion is never applied to medical and surgical services. It's explicitly on the face of the complaint. And we showed that we asked for this very information, this exact information from the plan pre-litigation. That is the NQTL disclosure request we asked for, but they refused to provide. They cannot argue that, they cannot refuse to provide the information on one hand and then argue we didn't plead it on the other. That's unfair. This court should adopt the standard for pleading a Parity Act claim articulated by the district courts in Borple and Steve C. and Bushell, as well as dozens of courts across the country. Number two, what, you know, all the standard ERISA claims were properly pled here. There are three typical ERISA claims in these kind of cases. A claim under A1B, A2, and A3 under ERISA 502. These claims have different but overlapping remedies. Since the Department of Labor is going to address the A1B argument, unless your honors have questions on that, I'm going to go ahead to the breach of fiduciary duty claim. A breach of fiduciary duty claim was properly pled here. There are three grounds for a breach of fiduciary duty claim under ERISA. The defendants only focus on the first two, which relate to financial losses to the plan, but the third one is very important here. The third says a breach of fiduciary duty can be remedied through equitable or remedial relief as the court may deem appropriate, including the removal of the fiduciary, and that's been recognized by the First Circuit under Evans v. Akers and Mogul v. Unum. The third ground goes to planned administration and management, and there's no doubt that when the plan, when a fiduciary does not follow federal ERISA law, such as the Mental Health Parity Act, the plan and its integrity is harmed. If a fiduciary caused the plan to be improperly administered, then that fiduciary may need to go, and the A2 claim is the only claim that can provide that remedy. Let me ask you, in another ground, in other words, your type of claim does not require monetary loss, correct? Yes, your honor, that's exactly right. That's exactly right, and that other circuits have found that that's very typically what happens in the Ninth Circuit when we bring these kind of claims. The third ERISA claim is the catch-all. Everybody agrees it applies here, but it's important to note it only applies if A1B and A2 do not. This court should not foreclose Parity Act claims under the first two ERISA provisions at this early stage of the litigation. We want to make sure that all of the remedies that are available to Planos are available at the end of the case. And finally, in terms of ERISA sanctions, since we did a supplemental briefing on that, I'm going to let that talk for us on this issue, but there's one point I want to raise. At this point, the court should consider if Raytheon has not done the NQTL analysis and completed it correctly. If they have done that, I mean, why won't they disclose it to us? The fact that Raytheon continues to refuse to disclose this information, even after all of this litigation, after Congress has acted to say you have to do it, Raytheon says, oh, there's nothing more than that. It's non-restorative because we say it's non-restorative. That should be an inference in this case that they have ignored the required NQTL analysis under law and that in application this exclusion is only applied to mental health conditions. We've asked repeatedly what are those physical conditions. If they provided us any information on that earlier, we would be in a much different place today. This court should reverse the trial court's decision and remand the case to proceed so NR can proceed on all of his claims. Are there additional questions from the court at this time? Yes, one question. Assuming the case is remanded, should you be given an opportunity to based on the 2021 Appropriations Act be allowed to amend your complaint or move for further relief? Do you think that would help you? Your Honor, we don't think we need to amend the complaint. We think we can go forward as is. We intend on February 11th, the day after the new law takes effect, to send another letter once again asking for these disclosures. We'll see what they say, but in the supplemental briefing they indicated that they're not going to give us anything further. If they don't, I think that will be evidence in this case as to that that defendant simply never did the required analysis. That too is a breach of fiduciary duty because it violates the Parent Act. Thank you. All right, thank you Mr. Khalil. Good morning, Your Honors. Again, this is Michael Khalil on behalf of the Acting Secretary of Labor as amicus in favor of Plaintiff Appellant. First, I want to thank you for allowing us to participate today. If you don't have initial questions, I just want to lay out at the outset what we think are the key facts and issues that warrant the Department's participation here. The key facts are that here, a beneficiary was denied planned benefits pursuant to exclusions that he alleges were applied in violation of ERISA's parity protections. His plan also denied him access to information to which he was entitled under Department regulations about the factors underlying the plan's application of those exclusions. Information that would have allowed him to better understand and better articulate his parity concerns. The Department's here today because it's our view the District Court's approach to these participants and beneficiaries to avail themselves of the parity acts protections in two ways. First, because of its categorical holding that these claims are only cognizable under Section 502A3. That holding is inconsistent with ERISA's language, with its structure, and with case law holding the benefit claims like those at issue here are cognizable under Section 502A1B. Second, and relatedly, the District Court's failure to take account of the violation of its disclosure obligations in determining whether the plaintiff adequately pled a parity act claim is problematic. And we think that this problem directly follows from the failure to construe this as benefits claim. So I'll talk now about why we think that this is properly pled as a 502A1B argument. First, we look at the structure and the language of ERISA. ERISA Section 502A1B provides a cause of action to recover benefits due under an ERISA plan's terms. That's what the plaintiff here seeks. The plaintiff alleges that there are plan terms, that is the exclusions at issue here, which violate ERISA and it's those plan terms of which the plan relies to deny  need to take those arguably illegal plan terms into account in construing the benefits claim. We know that those, if they really are illegal, and if they really do violate ERISA, those terms need to be disregarded. We know that because of ERISA Section 404A1D, which Congress instructed fiduciaries who administer plan benefits to only adhere to plan terms insofar as they are consistent with ERISA's requirements. And that's why, consistent with this statutory scheme, other courts, as we've noted in our brief, like the Third Circuit and Bauer, have held that in construing Section 502A1B claims, you administer the plan terms insofar unless you find a provision of ERISA that contains a, quote, contrary directive. Similarly, you look to the Supreme Court's jurisprudence in analogous cases. We've cited the Unum case in our brief, and in that case, the Supreme Court noted that there are background regulations, for example, state law regulations, that can inform what constitutes a Section 502A1B claim. And in fact, in Unum, the court noted that those state law provisions become, in effect, mandatory contract terms. Similarly, in Cigna v. Amara, the while you can't bring a claim to change a plan's terms under Section 502A1B, in those, in Section 502A1B does allow a court to look outside the plan's written language to figure out what a plan's terms are, and then referred, and supported for that proposition, referred to its prior decision in Unum. So this takes us to the practical problem I alluded to about the failure to account for the disclosure obligations. ERISA requires that claimants are entitled to a full and fair review of their benefits claims, which includes access to information necessary to make out your entitlement to a claim. It's particularly important in the context of a Parity Act claim, which is inherently comparative. It requires an understanding of the factors that underlie a plan's application of a treatment limitation on a purpose of the limitation. What evidence does the plan consider in determining whether the limitation should apply to a particular plan benefit in the relevant category? Because that kind of information is critical to the ability to plead a Parity Act claim, the Department's Parity Regulation provides that upon request a plan must provide such information to a claimant as part of the claim's process. So let me just ask you a technical procedural question. Your position on whether the request for information for disclosure was made to the right party? I guess it went to a claims administrator instead of the plan administrator. So what do you make of all that? Yes, so the Parity Regulation provides two ways for participants and beneficiaries to get this sort of information. One deems it part of the documents of the Section 104, and the second is in this provision that I was just referring to, the Claims Procedure Regulation says, well, you're also entitled to get that as part of the claims. So there's this factual question, I think, about whether this was properly made to the plan administrator and whether this person it was made to was a de facto plan administrator, and the Department takes no position on that factual question. But what's clear is that under that second route, the Claims Procedure Regulation, the obligation of disclosure is not on the plan administrator but rather on the plan itself. And here it does not seem there is any dispute that the plan received a request for this information and therefore had an obligation to provide it as part of its obligations. And I guess... You mean because it was on a CC list? I think the... When you say there's no question that it received it. Right, I think not just because it was on a CC list. As my recollection of the record is that the plan received the information request and said, you know, said here this information should be... The Claims Administrator, United, will be responding to it. So I don't think there's any dispute that the plan was in receipt of this request for information. The dispute is, well, were any of those parties acting as a quote plan administrator? That's my understanding, Your Honor. So going back to the process that you were describing to us, I mean their response is they don't cover anything habilitative, period. Whether it's for physical or anything. I mean is it your position that that should be a question of fact to be That's simply not a sufficient answer because of how Parity Act claims should be evaluated. I think it's more the latter, Your Honor, in that both the Parity Act and our regulations make clear that a plan has a duty to ensure that any treatment limitations like these exclusions are applied you know, comparably and in parity on both the mental health and the medical surgical side. Prior to this recent change in the law, neither the Congress nor the Department said exactly how that had to happen. The Department has issued guidance that said, well, one thing you have to do is you have to... You can't impose these treatment limitations for a discriminatory reason. You can't impose them for an arbitrary reason, but there are lots of reasons you can impose them for. For example, are you worried that a is subject to fraud or are you worried that a particular benefit that professionals who provide these services are properly credentialed? And then you identify the factor that is driving the purpose of the limitation and then you look at the evidence that you look at by which you determine whether it's going to be applied in parity. So whatever the sources are and then you know you figure out you document hopefully or you have some basis to show someone later on, here's how we made sure that we were applying this in parity. To date, the information that has been provided by Raytheon to demonstrate its compliance with its parity obligations we would say is insufficient. It's just no basis to tell why it did these or that it's in parity. And we think... And the last point, I see I'm out of time. Go ahead. So in other words, if people with mental health issues alone have certain kinds of problems that people with physical ailments may not, then parity would say that you need to have a reason why you're not covering it. So it's not an apples-to-apples comparison necessarily. I think that's right, Judge Chomsky. I think that's right. And that doesn't necessarily mean there might not be... This might be out of parity. I mean there might have been... They don't do analysis and say, well, but you know when you weigh everything, we have a good reason for doing this. But we just don't... We're not there yet. And I guess... I'm sorry, unless somebody else had a question, I would wrap up. Yeah, let me ask you one quick question. Your position is that the 2021 Appropriations Act now would give Raytheon very clear guidance as to what NR is entitled to. Am I correct? I admit them, yes. So yes. And that was actually going to be my last point, is that the trickiest question, it seems to me, in this appeal is probably, well, what does it take to allege a plausible, as applied, Parity Act violation? And rather than wrestle with that now, it might make more sense to... We certainly say reverse on the 502A1B issue, because as we've laid out, we think that's wrong. But then remand to have Raytheon provide these disclosures that are now required by law. The plaintiff will be able to, with the benefit of that information, provide more detail, which the district court seemed to think was required to plead a plausible claim. And then with that, all that information there, assess what is necessary for plausibility purposes. Thank you. Thank you, Your Honors. Judge Thompson, any other questions of counsel before we let him go? No, that was very helpful. Thank you. All right. Thank you. We'll hear from Mr. Kavanaugh then. Dan, we may need your help here. Mr. Kavanaugh, if you could unmute your video and unmute your audio. Thank you. May it please the court, my name is James Kavanaugh. With me is Catherine DeVita. We're representing the defendants Raytheon Company et al. If I could, I'd like to step back and address the question that you asked, Judge Thompson. The issue of the speech therapy, non-restorative speech therapy, and the habilitative services. And what the Parity Act asks us to do is to look at what they call quantitative or non-quantitative termination, termination, litigation, surgical conditions and treatment limitations, I'm sorry, to compare to see whether or not the action was taken, the limitation that was taken, in this case for speech therapy, that non-restorative speech therapy. Excuse me, Mr. Kavanaugh. Yes. Judge Howard, I think we lost Judge Helping. No, I'm back. Sorry. Oh, I'm here. All right. Sorry. Please proceed. We'll let you start over. All right. I heard it. I was hearing everything. I just muted myself, my video, accidentally. So the issue here is whether or not the exclusion from payment reimbursement of services for non-restorative speech therapy is a parity with other actions taken on the medical-surgical side. In other words, it sets up two categories of services that the health plans can address, can identify. And if the health plan decides not to provide any mental health services, that is acceptable. But once the plan decides to provide some, they have to do it at parity. How do you respond to Mr. Khalil's explanation that you're looking at it incorrectly? Our response is that we're not looking at it incorrectly because what we should be looking at and what we are looking at is a comparison of the speech therapy for non-restorative purposes versus with mental health people versus the same thing, speech therapy for non-restorative purposes on the medical-surgical side. But he said that if people with mental health issues have unique kinds of health problems, that you can't make that kind of comparison. That's how I understood his explanation to be. That the Parity Act requires a different kind of evaluation of coverage. That is not the case. We don't think that that situation, that position has been positive in this case either. These are standards that are applied to the plan as a whole. And this plan as a whole says we'll give you speech therapy but only if it's restorative. If you're out in an accident and you get hurt and you have to learn how to speak again because your mouth was damaged, then we will pay. If it's something that originates at your birth, so the speech therapy is not going to restore anything, there's no ability to speak that you had at any one time, then the plan doesn't pay. So if you have a congenital heart condition that only surfaces years later, or the manifestations of it surface years later, you all don't cover that. Because you had the heart condition when you were, as it turns out, when you were born. But it later transitions into a condition that is obvious. There's been some detriment to the person's health and therefore the treatment would be such as to bring that person's health back to the position there it was before the symptoms were displayed. So that would be covered. And the same thing with habilitative services. But what isn't covered is the situation where the person wants to exceed their capabilities that they've had at any time during their life. And it's that difference that's easy to compare here. This is a comparison statute. The whole purpose of the statute was to, as the Sebelius case says, is to eliminate discrimination in the handling of health care plans and benefits. And if we see here, because it's simple, it's one exclusion that applies for both people with medical surgical conditions and people with mental health situations. And on both of those instances, the test is exactly the same and the plan benefits are exactly the same. If it's non-restorative, there's no reimbursement for the speech therapy. If it's restorative, there is, both on the mental health side and on the medical surgical side. And that satisfies the Parity Act. And that's why we say that there's no need to send it back down. That's why Judge Stearns allowed the motion to dismiss. Because in this instance, it's a very simple comparison and nothing more is necessary. I thought I understood counsel for the Labor Department to disagree with that and to at least make the suggestion if he argued this forcefully, although I thought this is what he was in part arguing. So hypothetically speaking, if speech therapy is only needed in 0.00001% of the cases where we are talking about physical maladies, but someone with autism, it may show up in 25, 30, 45% of the cases that you can't do an apples-to-apples comparison. And that he's suggesting that you have to do a more nuanced parity analysis. He may not have argued it quite that way, but assume that he did for a second. What's your response to that? It seems to me that you're saying this is an easy case because you always do an apples-to-apples. And we've had a suggestion made that that's not how the law should be working. You are correct, Your Honor, that I am saying this is an easy case because of an apples-to-apples comparison. But to take your question, I'd characterize what you've asked and what you suggest could be looked at as determining whether or not there's a disparate impact from the application of this rule on non-restorative speech therapy to various classes of individuals. And that it could hit harder on some individuals than it might on others. But the regulations specifically say that disparate impact should not be considered in this analysis. And that's at 29 CFR section 2590.712C4.2. So, while what you posit makes sense in one sense, that's not what the law is and the regs have actually said, no, don't consider a disparate impact. So, there's not a judgment being made as to whether or not speech therapy should be an appropriate treatment for certain people or not. It's simply whether or not, under a health plan, determining who should pay, there is parity between what happens with people who have mental health issues and what happens with people who have medical, surgical procedures instead. If the exclusion targets treatment from people who have unique health situations, I thought the purpose of the Parity Act was to correct that. In other words, historically, health plans weren't covering such things as substance abuse and mental health treatment. And those health problems, those health concerns, have unique characteristics. So, you could set up a system that looks neutral on its face, but in fact, it would specifically exclude coverage only to this category of people. First of all, I do believe that goes in part back to the disparate impact issue. So, if you have people who are in conditions where they are more vulnerable, the regs have said disparate impact should not be considered. This is not a statute that is designed to find the best possible treatment for the employees of the company that is making this plan available. It's to get parity. Let me read to you the standard for non-quantitative treatment limitations. So, when you have a benefit and you want to put some limitation on it, say, for example, the number of visits somebody can make to a doctor or the plan will provide for, you have to look at quantitative and non-quantitative limits, treatment limits. That's where the speech therapy comes up because in the speech therapy, the limitation is, when am I going to pay it off if it's not for restorative purposes? But it's not making a medical judgment as to what is the best treatment for it's not providing any rights to get certain treatment unless, of course, there's an issue as to whether or not there's a medical necessity for it. That is a requirement for all of these things that we're talking about. But that medical judgment isn't made. It's whether or not the benefits applied and provided to the employees are more stringent if the employees have mental health issues than if they have medical surgical issues. It's just trying to bring those two sets of people together. So, one's not treated with less concern than the other one. That's not what it is. It's just whether or not there's parity between those two. Let me ask you, in order to determine that parity, shouldn't NR be entitled to all the documentation requested? And now with the 2001 Appropriations Act, wouldn't that be necessary before any determination can be made just as a matter of law? It probably would be under the new statute because the new statute does spell out additional things that the employers have to do with the group plan. Although I disagree with what the Department of Labor's lawyer said about the right of an employee, a participant in the plan, to get, as a matter of course, the materials that are prepared by the employee. Those materials are made available to the Department of Labor if requested. The new statute doesn't, I don't believe, require that they be turned over to participants or to be turned over to participants if the participant requests it of the company. But if there's a lawsuit that's been filed, obviously those would be discovery matters that would be subject to being turned over. Based on that answer, shouldn't this case be remanded at least for the plaintiff to get those documents? Again, the judge's ruling may end up being the same. It could be different. But shouldn't she be entitled now to all these documents under the 2021 Act? Well, we have a lawsuit that's been filed, Gerard, and there's been a decision made in the district court to dismiss two of the counts with prejudice and two of the counts without prejudice. The plaintiff decided not to follow Judge Stern's implied invitation to change the language in the complaint on those two counts. So we have a case that's reached its end in the trial court. And because the statute has been changed forward-looking, it doesn't have any retroactive effect, then I don't think the case should go back. I think it should stand on what the law was at the time the judgment was entered in the district court. But isn't it a- this is a civil matter. It's not a criminal matter with ex po facto concerns. And this case is live because it's still on appeal. Wouldn't this panel have to apply the 2021 Act? I would say no. At least there's an argument, isn't it, that the Act codifies, in part, the regulations, which you were arguing in your brief we should ignore because they weren't properly reflective of what the law required. We- you certainly- and there were some regulations that became law. I don't recall that we said you should ignore them. But maybe I'm just forgetting that. But you said we need not give them deference. I guess that's the legal way you put it. Yeah, well, that- was that with- I believe we did say that with respect to what the documents that needed to be turned over, whether or not they needed to be turned over to N.R. at that stage of the proceedings. And, of course, our position was that they did not need to be turned over. Now the obligation of the plan to provide materials, at least to the Department of Labor, if asked, and also in discovery, if there's a lawsuit, they'd be- had to be turned over as well. But I don't believe there were any other regs that we said shouldn't be ignored. There are changes for sure in the new statute, but it's our position that you should enforce the law as it existed at the time the district court made its rulings. Other questions from the panel? If not, thank you, Mr. Kavanaugh, and we will hear briefly from Ms. Hamburger again. Thank you, Your Honors. Thank you, Your Honors. I want to address briefly this point about the one-on-one comparison or apples-to-apples comparison to the Parity Act. That analysis promoted by Raytheon appears nowhere in the statute and nowhere in the regulations, nowhere in the sub-regulatory guidance. In fact, the Parity Act rules say that you have to do it on a classification-by-classification basis. So outpatient mental health services are compared to outpatient medical and surgical services, not non-restorative speech therapy to non-restorative speech therapy on each side. And the purpose behind this makes sense. It's designed to prevent evasion by applying exclusion to just one or maybe a handful of physical conditions when that service predominantly impacts people with mental health conditions. For instance, the Parity Act wanted—Congress and the Department of Labor wanted to make sure that a plan couldn't say, well, we're going to exclude all psychiatric treatment because we're going to exclude psychiatric treatment for mental health conditions, and we're going to exclude psychiatric treatment for medical and surgical conditions. And maybe they would say, oh, there's one medical condition or something we're classifying as a medical condition to meet that. That one-on-one analysis that Raytheon prefers has not been recognized anywhere in the statute or in the regulations. And the regulations set out that there has to be this very clear process to put things into classifications and then generically apply a treatment limitation to everything in each classification. And that's why it's so important to note, and why we pled in the complaint, that you see coverage for treatment that would be considered non-restorative for physical conditions. And, you know, we pointed to a bunch, but, you know, there's plenty more, right? I'm sure Raytheon and Discovery will find out that they treat terminal cancer, right, or they treat pain conditions where they're not being restored to a preexisting level. And so the concept behind the Parity Act's classification process is to make sure that services and treatment that are predominantly or substantially for mental health conditions are covered and are not improperly excluded. Chief Justice Howard, you asked about, well, this issue about who the letters got sent to, and it's in the record that Raytheon and Raytheon's counsel, and Mr. Bull is an employee at Raytheon, received the initial request. And they say in their briefing that they directed us multiple times to send the stuff to United Health Care. Well, so then we sent the letter, but we copied Raytheon and Mr. Bull's counsel on that letter. And so this issue about what we didn't say, address it directly to Mr. Bull, is unfair because we actually contacted Mr. Bull's counsel, and Mr. Bull's counsel told us, go to United Health Care. The plan and plan administrator and their legal representatives should not be able to misdirect consumers and then avoid providing the disclosures. And then the third thing that I wanted to raise, Your Honors, is this question about remand. We contend that the Parity Act claims have been adequately alleged. And on remand, we will still ask for the new disclosures. But it's clear that Raytheon either hasn't done the comparative analysis under law, doesn't apply this exclusion of physical conditions, despite its representations in briefing, or that they're going to refuse again. And so we ask that you consider with the remand a conclusion that claims have all been adequately pled, given the information is available. Because even today, defendants have indicated that short of discovery, they're not going to give us anything further. Unless the panel has any more questions, Your Honor, I'll rest. I meant to ask the Secretary. Do you know if the Secretary has requested this analysis? I do not. The Secretary does not have, until a week from today, the Secretary doesn't have authority to request these analyses from anyone, and I don't know whether the Secretary will. Okay. Thank you. Judge Helpe? No, thank you. All right. Thank you to all counsel, and we'll take this case under advisement. This concludes argument in this case. Attorney Hamburger, Attorney Khalil, and Attorney Kavanaugh, you should disconnect from the hearing at this time.